**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JASON SAGGIO,<br><br>　　　　Plaintiff,<br><br>v.<br><br>MEDICREDIT, INC,<br><br>　　　Defendant. | CASE NO.: 4:22-cv-01005-JAR |

**PLAINTIFF'S REPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS OR STRIKE**

Plaintiff Jason Saggio ("Plaintiff"), individually an on behalf of the putative class, opposes Defendant Medicredit, Inc.'s ("Defendant" or "Medicredit") Motion to Dismiss or Strike (Doc. 13), and states as follows:

### I.　Introduction

This case involves relatively mine-run allegations of Telephone Consumer Protection Act (the "TCPA") violations. Faced with a pleading that both clearly invokes federal jurisdiction and certainly states a claim, Defendant has taken the tact of creating, from whole cloth, arguments unsupported by law or logic, or previously rejected by this Court, amongst others. Tiptoeing dangerously near frivolity, Defendant, *inter alia*, draws distinctions between "initiating" and "making" calls that is unsupported by reason, the statutory text, or decades of precedential interpretation; makes constitutional arguments never acknowledged in the TCPA arena without the slightest shred of caselaw in support; and simply ignores express allegations concerning consent and the lack thereof. Defendant's garish grasping at straws should be rejected.

### II.　Standard of Review

"The existence of subject-matter jurisdiction is a question of law that this court reviews *de novo*." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011). "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack'" on jurisdiction. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). In a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* (internal citations omitted). "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* (cleaned up); *BP Chemicals Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 680 (8th Cir. 2002); *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

Class allegations may be dismissed or stricken "'when the pleadings are facially defective and definitively establish that a class action cannot be maintained.'" *St. Louis Heart Ctr., Inc. v. Forest Pharm., Inc.*, No. 4:12-CV-02224, 2013 WL 1076540, at *5 (E.D. Mo. Mar.13, 2013) (quoting *Wright v. Family Dollar, Inc.*, 2010 WL 4962838, at *1 (N.D. Ill. Nov.30, 2010)). However, "'where the dispute is factual and discovery is needed to determine whether a class should be certified, it may be premature to strike class allegations.'" *Id.* "The propriety of class action status can seldom be determined on the basis of the pleadings alone." *Walker v. World Tire Corp.*, Inc., 563 F.2d 918, 921 (8th Cir.1977). "'Where ... the pleadings themselves do not conclusively show whether the Rule 23 requirements are met, the parties must be afforded the opportunity to discover and present documentary evidence on the issue.'" *St. Louis Heart Ctr.*, 2013 WL 1076540, at *5 (citing *Walker*, 563 F.2d at 921).

## III.   Argument

### A.  Standing:  Plaintiff Alleges a Fairly Traceable Injury

2

Defendant argues that—assuming Plaintiff alleges injury in fact—his injury is not fairly traceable to Defendant's violation of the statute. Defendant's Memorandum In Support of Its Motion to Dismiss or Strike (Doc. 14) ("Memo") at 4. Although certainly not clear, Defendant appears to suggest that the statute covers only the prerecorded message portion of the call, not the actual placement of the call. Defendant argues that because "artificial or prerecorded voices are not, and are not alleged to be, a means to *initiate* a call," "the earliest point at which Medicredit could have violated the TCPA on Saggio's allegations is when it played the recorded message after he answered the phone." Memo at 5 (emphasis in original); *see also id.* ("Thus, Medicredit acted lawfully when it dialed the call. And Medicredit acted lawfully at the moment Saggio answered the call. It is only upon playing its prerecorded message that Medicredit could have violated the TCPA."). And, the argument goes, by the time that Defendant played its prerecorded message, all of Plaintiff's alleged injuries "already had come to pass" because the "phone already had rung and disrupted and interrupted Saggio." *Id.* Defendant's argument—unsurprisingly devoid of *any* statutory analysis or supporting case law—is fundamentally flawed.

The TCPA provision at issue expressly renders "unlawful" for "any person" "to *make* any call … using … an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service …." §227(b)(A)(iii) (emphasis added). The action the statute prohibits is clearly understood by its two action words: to "make" and to "us[e]." The prohibited conduct, then, is clearly *both* making a call *and* using a prerecorded voice in doing so. Defendant cannot by simple expedience divorce one verb from the other, or ignore one verb in favor of the other.[1] The

---

[1] Indeed, what if the logical reverse were also true? Defendant would presumably object strenuously to a statutory construction in which simply "mak[ing]" a call—wholly divorced from "using" an artificial or prerecorded voice—to a mobile number was all that was required for liability to attach. What's good for the goose is good for the gander.

prerecorded message in this case flows directly from the placement of the call, and the placement of the call directly precedes the prerecorded message.  Clearly, then, there is a "causal connection between the injury and the conduct complained of," and Plaintiff's injury as alleged is "'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party ....'" *Lujan*, 112 S. Ct. at 2130.  That is enough.[2]  *Carl v. First Nat'l Bank of Omaha*, No. 2:19-CV-00504-GZS, 2021 WL 2444162, at *7 (D. Me. June 15, 2021) ("Given that the placement of each violating call is already sufficiently concrete in itself, Plaintiff need not have done more.").

Moreover, on the facts alleged, Defendant misconstrues and restricts Plaintiff's injuries as relating only to the initial call and the phone ring, not the prerecorded message. Memo at 5-6. To be clear, Plaintiff alleges:

> 26. Plaintiff's telephone number, XXX-XXX-6744, is assigned to a cellular telephone service.  Plaintiff received the call at issue at that number.
>
> 27.During the relevant time period, Plaintiff carried his cellular phone with him because he wanted to be available for his work, family, and friends.
>
> 28. On or about July 13, 2022 Plaintiff received a call from Defendant at (800) 823-2318.

---

[2] Without analysis, Defendant notes the distinction between Section 227(b)(1)(A), regarding prerecorded calls to mobile phones, at issue here, and Section 227(b)(1)(B), regarding prerecorded calls to residences, which prohibits "*initiat[ing]*" a call using an artificial or prerecorded voice "to deliver a message ...." Memo at 5 (emphasis added).  But "*making*" versus "*initiating*" a call seems a distinction without a difference.  Both clearly envision responsibility not only for the content of the call (and the nature of the recipient) but also, necessarily, for causing the call to be made in the first place.  *See Merriam-Webster Dictionary* ("*making*," transitive verb, primary definition, "to bring into being by forming, shaping, or altering material") ("*initiating*," transitive verb, primary definition, "to cause or facilitate the beginning of: set going").  In any event, Defendant provides no precedential support, logical textual analysis, or the like for its argument, which, alone, counsels in favor of rejecting it.

4

29. When Plaintiff answered the call, a pre-recorded or artificial voice stated that it was looking for a consumer named "Lucy," and if the recipient of the call was not "Lucy" to press 2.

30. Defendant's call invaded Plaintiff's privacy and intruded upon his right to seclusion.  The call frustrated and upset Plaintiff by interrupting his daily life and wasting his time.

31. Defendant's call intruded upon and occupied the capacity of Plaintiff's cellular phone and depleted its battery.  The call temporarily seized and trespassed upon Plaintiff's use of his cellular phone and caused him to divert attention away from other activities to address the call.

Complaint (Doc. 1) at ¶¶ 26-31.  These allegations clearly envelop the entirety of the "call" at issue, including the phone ring and the prerecorded message, which prompted Plaintiff to press 2 because he was not "Lucy," the intended recipient; they do not, as Defendant would have it, parse out specific episodes attributable to specific aspects of Defendant's conduct.  *See, e.g.*, Memo at 5 ("And while Saggio claims he was 'frustrated and upset' by the call, he does not allege he was 'frustrated and upset' by the prerecorded message, but rather because call itself 'interrupt[ed] his daily life and wast[ed] his time' which, as explained, had already happened."). On these facts, in addition to the phone ring, there is the prerecorded message, which, unlike a prerecorded announcement requiring no action, prompted Plaintiff to act and, as explained *infra*, to cause the very nuisance and disruption that the TCPA intends to thwart.

Defendant also asks the Court to "[a]ssume, counterfactually, that instead of a prerecorded message, a live operator had asked him whether he was Lucy."  Memo at 6.  To the extent this exercise in supposition should even be entertained (it should not), the result is the same for purposes of standing.  This theory was tried and found wanting in *Throndson v. Huntington Nat'l Bank*, No. 2:19-CV-1789, 2020 WL 3448281, at *6–8 (S.D. Ohio June 24, 2020):

Plaintiff testified at deposition that he would have been annoyed even if a live person had called him (as opposed to receiving a prerecorded call). Defendant argues that, because Plaintiff admitted he would have been annoyed even if a live agent had called seeking to collect Cousins' debt, any injury he suffered is not traceable to Defendant's violation of the TCPA—using a prerecorded voice to call Plaintiff's cell phone.

Defendant's argument is unpersuasive. The second requirement of standing is "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Macy*, 897 F.3d at 752 (internal quotation marks and citation omitted).

Here, Plaintiff's injury is directly traceable to Defendant's prerecorded voice messages. Without them, he would not have suffered the injury. No independent action by another party interrupted the causal chain.

It is irrelevant to the standing analysis whether Plaintiff would have suffered the injury even if Defendant called him in a manner that did not violate the TCPA. An injury caused by a use of prerecorded calls and an injury caused by a call from a live agent are both injuries traceable to Defendant's conduct, meaning there would be standing to sue for both injuries, but a claim based on the latter would fail on the merits because it is not a violation  § 227(b)(1)(A)(iii) to initiate a call via a live agent. To hold otherwise would virtually preclude anyone from having standing to assert a violation of  § 227(b)(1)(A)(iii) due to an entity's use of prerecorded calls.

*Throndson*, 2020 WL 3448281, at *6–8 (cleaned up).

In any event, the procedural posture—which presents a facial,[3] not a factual, attack on jurisdiction—restricts the inquiry "to the face of the pleading, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).   And "[w]hen ruling on a Rule 12(b)(6) motion to dismiss, a court must accept as true all of the factual allegations in the complaint and view them in the light most favorable to the plaintiff." *Pets Alone Sanctuary of*

---

[3] *See* Memo at 2.

6

*Lincoln Cnty. v. Midwest Fam. Mut. Ins. Co.*, No. 4:22-CV-775 PLC, 2022 WL 16758603, at *2 (E.D. Mo. Nov. 8, 2022) (citing *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).  Defendant does the opposite by reading into the Complaint facts that do not exist and construing the facts in the light most favorable to it.  Defendant invites error.

**B.  Standing: Plaintiff Alleges a Concrete Injury in Fact**

Contrary to controlling precedent, the facts alleged, and logic, Defendant attempts to argue that Plaintiff fails to allege a concrete injury in fact.  Defendant's meritless argument fails for a host of reasons.

*Golan v. FreeEats.com*, 930 F.3d 950, 955–59 (8th Cir. 2019) controls.  In *Golan* the defendant left two prerecorded voice messages on the plaintiffs' answering machine regarding a survey it was conducting. In a prior appeal, the Eighth Circuit had already found that plaintiffs had Article III standing.  But the court revisited the issue in light of the Supreme Court's intervening decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).  *Golan*, 930 F.3d at 957. In doing so, the court considered *Spokeo's* dictates regarding standing in the context of statutory harm, including "that an 'injury in fact' be 'concrete' and 'particularized,'" and those "are separate inquiries," and that:

> A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. ... [A plaintiff cannot,] for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549. But the Court clarified that this does not rule out all intangible injuries — even "intangible injuries can nevertheless be concrete." *Id.*

*Golan*, 930 F.3d at 958.  Against this backdrop, the Eighth Circuit held that the harm caused by the two prerecorded messages was sufficient to confer standing:

7

At issue here is whether the intangible injury claimed by the Golans — the receipt of two answering machine messages — is a concrete injury. The Supreme Court in *Spokeo* instructed that "[i]n determining whether an intangible harm constitutes an injury in fact, both history and the judgment of Congress play important roles." *Id.* Conduct that is actionable under the TCPA has, of course, been identified as a cognizable injury by Congress. This is not dispositive, but is relevant to whether such conduct creates a concrete injury. *See Spokeo*, 136 S. Ct. at 1549.

"Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice," courts should "consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* An alleged harm need not actually have been actionable at common law to satisfy this inquiry, rather it must have a "close relationship" to the type of harm that has traditionally been recognized as actionable. *See Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (discussing *Spokeo*, 136 S. Ct. at 1549).

The harm to be remedied by the TCPA was "the unwanted intrusion and nuisance of unsolicited telemarketing phone calls and fax advertisements." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). *The harm here was the receipt of two telemarketing messages without prior consent. These harms bear a close relationship to the types of harms traditionally remedied by tort law, particularly the law of nuisance. See id.* at 1043–44; *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019); *Susinno*, 862 F.3d at 350–52. It is not dispositive whether unsolicited telephone calls are actually actionable under any common law tort because "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo*, 136 S. Ct. at 1549 (alteration in original) (quoting *Lujan*, 504 U.S. at 578, 112 S.Ct. 2130). *Nor does it matter that the harm suffered here was minimal; in the standing analysis we consider the nature or type of the harm, not its extent. See generally id.* We thus conclude the Golans suffered a concrete injury and have standing.

*Golan*, 930 F.3d at 958–59 (emphasis added).  In *Susinno*, cited favorably by the court in *Golan*, the Third Circuit held that the plaintiff "in asserting 'nuisance and invasion of privacy' resulting from a *single prerecorded telephone call*, her complaint asserts "the very harm that Congress sought to prevent," arising from prototypical conduct proscribed by the TCPA.  *Susinno*, 862 F.3d

at 351 (emphasis added).  In *Van Patten*, also cited with favor in *Golan*, the Ninth Circuit held that two unwanted text messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect."  *Van Patten*, 847 F.3d at 1043.

And in *Melito*, also cited in *Golan*, the Second Circuit held that the receipt of unsolicited text messages, without more, was enough for standing purposes under the TCPA:

> The principal question we are tasked with deciding is whether Plaintiffs' receipt of the unsolicited text messages, sans any other injury, is sufficient to demonstrate injury-in-fact. We hold that it is. First, the nuisance and privacy invasion attendant on spam texts are the very harms with which Congress was concerned when enacting the TCPA. Second, history confirms that causes of action to remedy such injuries were traditionally regarded as providing bases for lawsuits in English or American courts. Plaintiffs were therefore not required to demonstrate any additional harm.

923 F.3d at 88. Citing *Golan*, the Fifth Circuit also recently held that "unwanted communications can inflict a concrete injury analogous to a nuisance or public nuisance." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 826 (5th Cir. 2022).  All of these cases and more[4] carefully considered the harms that the TCPA seeks to eradicate—nuisance and invasion of privacy—have distinct corollaries to harms that were traditionally actionable in the historical context of the common law.  Nothing about this case changes the *Golan* calculus or renders it inapposite.

---

[4] *See also Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462–63 (7th Cir. 2020) (receipt of five text messages constitutes concrete injury, observing similarity to intrusion upon seclusion tort); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019) ("The receipt of more than one unwanted telemarketing call made in violation of the provisions enumerated in the TCPA is a concrete injury that meets the minimum requirements of Article III standing."); 1 *McLaughlin on Class Actions* § 2:20 n.31 (19th ed.) (collecting cases).

Defendant relies heavily, if not almost exclusively, on what may be the single discordant appellate court decision on the issue, *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), in which the Eleventh Circuit held that receipt of a single text was insufficient to support standing. Defendant apparently likens the single prerecorded message here to the single text at issue in *Salcedo* that prompted the court to hold that "the receipt of a single text message is qualitatively different from the things Congress was concerned about when it enacted the TCPA."  But, as found by a court addressing this argument against the clear weight of authority, *Salcedo*, is readily distinguishable:

> Against this massed authority, Defendant offers a single decision: *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019). . . .  However, less than two years later, the Eleventh Circuit has already made it exceptionally clear that *Salcedo* is a narrow decision. First, in *Cordoba*, the Circuit clarified that the receipt of more than one call was sufficiently concrete. 942 F.3d at 1270. More recently, in *Trichell v. Midland Credit Mgmt.*, the Circuit clarified that the fact *Salcedo* involved unwanted text messages set it apart from cases involving unwanted telephone calls. *See* 964 F.3d 990, 998–99 (11th Cir. 2020) ("Although the statute has been understood to apply to both telephone calls and text messages, the TCPA's statutory findings highlight the burden imposed by unwanted calls but say nothing about unwanted texts. In part, this Court relied on those findings in holding that the receipt of unwanted phone calls is a concrete injury, but the receipt of a single unwanted text message is not."). For both of these reasons, *Salcedo* can be readily distinguished.

*Carl v. First Nat'l Bank of Omaha*, 2021 WL 2444162, at *7 (D. Me. June 15, 2021) (cleaned up).

*Salcedo* is clearly an outlier that has not replicated elsewhere,[5] much less in this Circuit. And if the real gripe is that the harm caused by one prerecorded message seems minimal, the cases cited above, including *Golan*, have overwhelmingly dispatched with it:  "*Nor does it matter that*

---

[5] *See* 1 *McLaughlin on Class Actions* § 2:20 n.32 (19th ed.) (collecting cases and noting *Salcedo* as sole outlier).

10

*the harm suffered here was minimal; in the standing analysis we consider the nature or type of the harm, not its extent." Golan*, 930 F.3d at 959 (emphasis added).

And to the extent Defendant relies on the reasoning in *Salcedo* for the proposition that the TCPA targets only harms (including invasion of privacy and nuisance) in the residential context, the Fifth Circuit clarifies the misconception in detail:

> On the other hand, the Eleventh Circuit seized on the fact that some of the TCPA's legislative findings refer to "*residential* telephone subscribers" and banning telemarketing calls "to the *home*." TCPA § 2, ¶¶ 10, 12 (emphases added); *see Salcedo*, 936 F.3d at 1169. In the Eleventh Circuit's view, "Congress's legislative findings about telemarketing suggest that the receipt of a single text message is qualitatively different from the kinds of things Congress was concerned about when it enacted the TCPA." *Salcedo*, 936 F.3d at 1169. We reject this reasoning for three reasons.

> First, the TCPA expressly covers cellular phones. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting unsolicited ATDS calls "to any telephone number assigned to a ... cellular telephone service"). The TCPA also includes text messaging in its prohibitions on transmitting false caller ID information. *See id.* § 227(e)(1). If the statute only prohibited nuisances *in the home*, then it would make little sense to prohibit telemarketing to mobile devices designed for use *outside the home*.

> Second, the TCPA addresses "nuisance and invasion of privacy" in a variety of other non-residential contexts. The Act prohibits ATDS or prerecorded calls to, *inter alia*, (1) "any emergency telephone line," (2) "the telephone line of any guest room or patient room of a hospital," or (3) "a paging service." *Id.* § 227(b)(1)(A). It further proscribes using a fax machine or computer to send an unsolicited fax advertisement. *Id.* § 227(b)(1)(C). And the Act makes it unlawful to use an ATDS "in such a way that two or more telephone lines of a multi-line business are engaged simultaneously." *Id.* § 227(b)(1)(D). The text of the Act thus shows Congress sought to remediate "nuisance and invasion of privacy" in a broader set of circumstances, not just in the home.

> Third, Congress delegated authority to the FCC to "prescribe regulations" implementing the TCPA, *id.* § 227(b)(2), and to exempt commercial calls only where such exemptions "will not adversely affect the privacy rights" the TCPA protects, *id* § 227(b)(2)(B)(ii). It did so after finding that the FCC "should have the

flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy." TCPA § 2, ¶ 13. No part of this delegation limits the FCC to considering nuisances and privacy only in the home.

*Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690–91 (5th Cir. 2021).

Moreover, the list of referent torts that Defendant arbitrarily assigns to the harm asserted here—invasion of privacy, trespass to chattels, and emotional distress[6]—inexplicably excludes *nuisance*, which is the very corollary harm that *Golan* found "particularly" applicable: *"The harm here was the receipt of two telemarketing messages without prior consent. These harms bear a close relationship to the types of harms traditionally remedied by tort law, particularly the law of nuisance*." 930 F.3d at 959 (emphasis added). Defendant does not explain why it omits any discussion about nuisance, when nuisance is fundamentally and historically relevant to the analysis. *Salcedo* itself "never addressed public nuisance." *Cranor*, 998 F.3d at 693. And that is a mistake. As discussed in *Cranor*:

> Here, Cranor's asserted injury has a close relationship to a harm actionable at common law: public nuisance.
>
> A public nuisance is an "unreasonable interference with a right common to the general public." RESTATEMENT (SECOND) OF TORTS § 821B (Am. L. Inst. 1979). That broad category encompasses any "act not warranted by law, or omission to discharge a legal duty, which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all." *Ibid.* (quotation omitted). As a leading treatise explains:
>
>> [Public nuisance] includes interferences with the public health, as in the case of a hogpen, the keeping of diseased animals, or a malarial pond ... ; with public morals, as in the case of houses of prostitution, illegal liquor establishments, [or] gambling houses ... ; with the public peace, as by loud and disturbing noises, or an opera

---

[6] *See* Memo at 8, 11, 12.

> performance which threatens to cause a riot; with the public comfort, as in the case of bad odors, smoke, dust and vibration.

W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 90, at 643–44 (5th ed. 1984) (footnotes omitted) . . . .

Traditionally, the sovereign would address a public nuisance through "criminal prosecution and abatement by way of an injunctive decree or order." PROSSER & KEETON, *supra*, at 643. A private citizen could also sue, but only if he "could show that he had suffered damage particular to him[ ] and not shared in common by the rest of the public." *Id.* at 646; . . . .

Here, Cranor's injury "has a close relationship to" common law public nuisance. *Spokeo*, 136 S. Ct. at 1549. Cranor wants to use our Nation's telecommunications infrastructure without harassment. In that sense, he's similar to someone who wants to use another piece of infrastructure like a road or bridge without confronting a malarial pond, obnoxious noises, or disgusting odors. And 5 Star is similar to someone who illegally emits pollution or disease that damages members of the public.

Moreover, Cranor alleges a special harm not suffered by the public at large. As Congress acknowledged in enacting the TCPA, some members of the general public might be able to avoid robodialed advertisements—but not everyone can: "Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly ... [and] place an inordinate burden on the consumer." TCPA § 2, ¶ 12. And Cranor alleges he's in that latter group: 5 Star's "aggravating and annoying text messages trespassed upon and interfered with Plaintiff's rights and interests in his cellular telephone." After receiving the unwanted text, Cranor was prompted to read the message and send a "STOP" request. The text itself "deplet[ed] the battery life on [Cranor's] cellular telephone and ... us[ed] minutes allocated to [him] by his cellular telephone service provider." Thus, not only has Cranor alleged an unreasonable interference with a right common to the public, he also has alleged personal injuries that separate him from the public at large.

That's enough to show a "close relationship" between his injury and an actionable public nuisance at common law. *See Spokeo*, 136 S. Ct. at 1549.

13

*Cranor*, 998 F.3d at 691–93 (citations omitted). Likewise here. As recounted above, Plaintiff's allegations of harm—viewed, as they must be, in the light most favorable to him—bear a close relationship, at the very least, to public nuisance and invasion of privacy at common law.  *See* Complaint ¶¶ 26-30.  Under *Golan* and the cases cited *supra*, that is enough.

Moreover, Defendant's analogue torts, and its analysis of them, is also flawed because, at least as to invasion of privacy and trespass to chattels, Defendant grounds these torts to the common law of *Missouri*,[7] not the perforce more historically profound common law of the United States and England.  *See Golan*, 930 F.3d at 950 ("Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, courts should consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.") (quoting *Spokeo*, 136 S. Ct. at 1549) (cleaned up).

Further, Defendant's insistence that the historical tort analogues match the alleged harm— element by element—directly contradicts Supreme Court authority.  Only a "close relationship" is required, not an exact match.  *Id.*  Thus, "[i]t is not dispositive whether unsolicited telephone calls are actually actionable under any common law tort because Congress may elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* (quoting *Spokeo*, 136 S. Ct. at 1549 (cleaned up); *see, e.g.*, *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1261–62 (11th Cir. 2022) (Newsom, J., dissenting) (construing *Spokeo* and *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)) ("As I'll explain next, by insisting on a rigid, anti-*TransUnion* element-for-element test, the majority departs from the heretofore unanimous view among the circuits about how to implement the 'close relationship'

---

[7] *See* Memo at 8, 11.

standard. And in doing so, the majority denies Congress *any* breathing space in which to recognize judicially enforceable rights that didn't exist at common law.").

### C.  The Putative Class Members Have Standing

Notably, as Plaintiff has standing here, so too does the putative class. "A putative class action can proceed as long as one named plaintiff has standing." *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) (quoted by *Golan*, 930 F.3d at 958 n.5). In *Golan* the certified class included "all persons to whom the defendants initiated the calls at issue."  The court noted that its decision did not consider "whether the significant portion of absent class members who neither answered the call nor received answering machine messages would have standing—a group that is likely based in part on calls that rang while no one was at home or calls to disconnected numbers." *Golan*, 930 F.3d at 958 n.5.  This issue is not present here.

The putative class here is defined as follows:

> All persons or entities within the United States who (1) within four years of the commencement of this action, (2) received a nonemergency telephone call from Medicredit, (3) to a cellular telephone line, (4) *through the use of an artificial or prerecorded voice*, and (4) who did not provide express consent to receive calls from Medicredit at that cellular number.

Complaint ¶ 32 (emphasis added). Enumerated factor (4)—"through the use of an artificial or prerecorded voice"—is important here because it perforce obviates the potential issue of overinclusion in *Golan*.  Because the call needs to have included an "artificial or prerecorded voice," and because, as Defendant notes, "artificial or prerecorded voices are not, and are not alleged to be, a means to *initiate* the call,"[8] the class necessarily includes only those people that actually receive the call either by hearing the artificial or prerecorded voice live or, as the named

---

[8] Memo at 5.

plaintiffs in *Golan*, hearing it in their voicemail.  By its own definition, then, the putative class does not include anyone who simply received a call from Defendant.  *Golan*, 930 F.3d at 958 n.5. Rather, it is defined "in such a way that anyone within it would have standing." *Id.* (quoting *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018)).

### D.  Separation of Powers

Without any authority whatsoever supporting its position—that the TCPA is unconstitutional because it infringes on powers reserved only for the executive branch of government—Defendant urges "caution" about finding Article III standing here because doing so "would undermine the separation of powers."  Memo at 13-17. In the 30 plus years that the TCPA has been on the books, and through its many trips to the Supreme Court in that time, Defendant cannot point to ***any*** authority that has found the TCPA unconstitutional on this ground, or even discussed this (absurd) proposition. And, unsurprisingly, Plaintiff has found none.

And on this point Plaintiff simply notes that *not* finding standing in this case would encroach on the power of *Congress* to pass remedial legislation like the TCPA.  As noted in *Cranor*:

> "As the branch charged with lawmaking, Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Ibid.* Its judgment is therefore "instructive and important." *Ibid*. Here, the text of the TCPA shows Congress determined that nuisance arising out of unsolicited telemarketing constitutes a cognizable injury.

> In enacting the TCPA, Congress found that "unrestricted telemarketing can be an intrusive invasion of privacy" and a "nuisance." Pub. L. No. 102–243, § 2, ¶¶ 5, 10, 105 Stat. 2394, 2394 (1991); *see also Salcedo v. Hanna*, 936 F.3d 1162, 1168 n.6 (11th Cir. 2019) ("[B]ecause the Supreme Court has instructed us to consider the judgment of Congress in assessing Article III standing, we will consider the congressionally enacted findings as informative of that judgment." (quotation omitted)). The Act itself was prompted by consumer outrage at the "proliferation of intrusive, nuisance" calls from telemarketers. TCPA § 2, ¶ 6. A balance had to

be struck between "individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade" so as to "protect the privacy of individuals and permit[ ] legitimate telemarketing practices." *Id*. ¶ 9. In Congress's view, the only way to achieve that end was to completely ban certain types of calls, while permitting the FCC regulatory flexibility to allow others not at issue here. Id. ¶ 12. Cranor's asserted injury is thus exactly the one Congress sought to remediate in enacting the Act.

998 F.3d at 691–93.

Ultimately, much of Defendant's inventive constitutionality arguments devolve into a recapitulation of its standing arguments.[9] Plaintiff has thoroughly debunked those above, which, under Defendant's construction of its argument, undermines the constitutionality theories as well.[10] Suffice to say, Plaintiff is seeking to vindicate his personal rights, related to an improper call he personally received. He is not seeking "freewheeling power" to regulate Defendant by lawsuit.

### E. Injunctive Relief

Defendant argues that Plaintiff (and the putative class) lack standing to pursue injunctive relief because Plaintiff does not allege that he is at risk of future harm. In *Buchanan v. Sullivan*, No. 8:20-CV-301, 2021 WL 149052, at *1–2 (D. Neb. Jan. 15, 2021), a case involving unsolicited prerecorded calls under Section 227(b)(1)(A)(iii), the provision at issue here, the court granted the plaintiff a preliminary injunction because the TCPA specifically provides for that relief under Section 227(b)(3)(A): "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State-- (A) an action based on a violation of this

---

[9] *See, e.g.*, Memo at 15 ("And that returns us to standing: one who suffers a concrete injury from a violation of federal law may sue without running afoul of separation of powers and the Take Care Clause because she is not given freewheeling power to sue simply to vindicate federal law—a task reserved to the President.").

[10] It is utterly unclear what role Defendant believes statutory damages play for purposes of constitutionality or standing. Memo at 16. Seemingly, it again devolves to Article III standing, Memo at 16-17, which Plaintiff demonstrates.

subsection or the regulations prescribed under this subsection to enjoin such violation.". And in an action for a statutory injunction, "once a violation has been demonstrated, the moving party need only show that there is a *reasonable likelihood* of future violations in order to obtain relief." *Buchanan*, 2021 WL 149052, at 2 (citing *S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) and other S.E.C. decisions).  For the reasons articulated in *Buchanan*, Defendant's motion should be denied.  Of course, Plaintiff seeks leave to amend if the Court disagrees.

### F.  Plaintiff States a Claim

The TCPA makes it unlawful to

> make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service ....

47 U.S.C. § 227(b)(1)(A)(iii).  And a claim under this section of the statute "has three elements: (1) a call to a person's cellular telephone number, (2) using an automatic telephone dialing system [or prerecorded or artificial voice], (3) without the person's prior express consent."  *Grome v. USAA Sav. Bank*, 557 F. Supp. 3d 931, 935 (D. Neb. 2021).

Despite the obvious record, Defendant repeatedly insists that Plaintiff "does not allege absence of prior express consent."  Memo at 20.  But he does.  Plaintiff alleges that "Defendant placed non-emergency telephone calls to the wireless phone number of Plaintiff using a prerecorded or artificial voice *without Plaintiff's prior express consent* in violation of federal law, including 47 U.S.C. § 227(b)(1)(A)(iii)."  Complaint ¶ 44 (emphasis added); *see also id.* at ¶ 13 ("To enforce the TCPA, recover penalties, and end Medicredit's violations, Plaintiff brings this action on behalf of a class to whom Medicredit made calls using automated and prerecorded messages, *without consent*.").  And, as recounted *supra*, he alleges lack of prior express consent on behalf of the class as well.  *Id.* at ¶¶ 32 (class definition, describing members "who did not

provide express consent to receive calls from Medicredit"), 37 (common question or law and fact, "[w]hether Defendant had prior express consent to place the prerecorded calls").

Again, devoid of any caselaw, and contrary to the clear text of the statute, Defendant appears to add an additional, fourth element to claims under Section 227(b)(1)(A)(iii): that the "subscriber [of the mobile phone service] did not consent, or that a non-subscriber customary user of the telephone number in a family or business calling plan did not consent." Memo at 20. But no such requirement exists. § 227(b)(1)(A)(iii); *see also, e.g.*, *Grome*, 557 F. Supp. 3d at 935. If anything, as Defendant appears to concede,[11] the issue—if there is one—is really one of consent, which is an affirmative defense for which *Defendant*, not Plaintiff, carries the burden of proof. *See St. Louis Heart Ctr., Inc. v. Forest Pharm., Inc.*, 2013 WL 1076540, at *2 n. 2, *6 n. 6 (E.D. Mo. March 13, 2013); *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1145–47 (W.D. Mo. 2020) (citing *St. Louis Heart Ctr.* and collecting cases); *see also Zean v. Fairview Health Servs.*, 858 F.3d 520, 525 n.3 (8th Cir. 2017).

In any event, even if Defendant's additional subscriber/non-subscriber element existed (it does not), Plaintiff's allegations, as stated, would meet it. Plaintiff alleges that he is a "called party" under the statute;[12] that, "[r]egarding telephone numbers assigned to a cellular service, the statute prohibits calls using an artificial or prerecorded voice, other than emergency calls or calls placed with the prior express written consent of the called party";[13] that he received Defendant's call at "Plaintiff's telephone number, [which] is assigned to a cellular telephone service";[14] and that Plaintiff "carried his cellular phone with him."[15]

---

[11] Memo at 19 n.12.
[12] Complaint at ¶ 16.
[13] *Id.* at ¶ 24.
[14] *Id.* at ¶ 26.
[15] *Id.* at ¶ 27.

Given that the Court must assess the pleadings in the light most favorable to Plaintiff, it can certainly be infered from these allegations that Plaintiff was indeed the "subscriber" of the cellular service on his mobile phone or a "non-subscriber customary user of the telephone number in a family or business calling plan," whatever that means. *See Pets Alone Sanctuary of Lincoln Cnty. v. Midwest Fam. Mut. Ins. Co.*, No. 4:22-CV-775 PLC, 2022 WL 16758603, at *2 (E.D. Mo. Nov. 8, 2022) ("When ruling on a Rule 12(b)(6) motion to dismiss, a court must accept as true all of the factual allegations in the complaint and view them in the light most favorable to the plaintiff.") (citing *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013)).

### G. Motion to Strike Class Allegations Is Premature at Best

#### 1. Prior Express Consent

Defendant argues that individualized issues regarding its affirmative defense of consent preclude class treatment and warrant the Court's striking of the class allegations under Rule 12(f). Not so; and certainly not now.

Defendant Medicredit has already tried—and lost—the same argument before this very Court in a published decision. In *Miles v. Medicredit, Inc.*, 526 F. Supp. 3d 487, 493 (E.D. Mo. 2021) (Ross, J.), the plaintiff brought a putative class action against Medicredit for violating the TCPA by—as here—sending prerecorded voice messages to consumers without their prior express written consent.[16] As here, at the pleading stage, Medicredit argued that "fact-specific inquiries cannot be resolved with class-wide proof," including "whether Medicredit's call was made with

---

[16] One of the two proposed classes, the Prerecorded Voice Class, was defined as follows:
> All persons and entities throughout the United States (1) to whom Medicredit, Inc. placed, or caused to be placed, at least one call (2) directed to a number assigned to a cellular telephone service, by (3) using an artificial or prerecorded voice, (4) from December 16, 2017 through and including the date of class certification, (5) where the called party did not have an account with Medicredit, Inc.

*Miles*, 526 F. Supp. 3d at 493.

prior express consent." *Id.* at 493.  The plaintiff, as here, argued that "Medicredit's motion is premature and that its fact-specific arguments against class-certification should only be considered after discovery." *Id.*  In denying Medicredit's motion, this Court afforded the following bases, which are equally applicable here:

> [T]he Eighth Circuit has also noted that "[t]he propriety of class action status can seldom be determined on the basis of the pleadings alone." *Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977). To determine the nature of class allegations and rule on compliance with Rule 23 requirements, the court must possess sufficient evidence. *St. Louis Heart Ctr., Inc. v. Forest Pharm., Inc.*, No. 4:12-CV-02224 JCH, 2013 WL 1076540, at *5 (E.D. Mo. Mar. 13, 2013) (citing <u>Walker</u>, 563 F.2d at 921). Where the pleadings fail to conclusively demonstrate whether the requirements of Rule 23 are met, the parties must be given the opportunity to discover and present documentary evidence on the class certification issue. *Id. See also Giesmann v. Am. Homepatient, Inc.*, No. 4:14CV1538 RLW, 2015 WL 3548803, at *6 (E.D. Mo. June 8, 2015) ("The Court is not entertaining a motion to certify the class and finds these issues better left for a fully briefed and supported motion for class certification."). Courts in this Circuit have repeatedly remarked that motions to dismiss class allegations should be met "with a great deal of skepticism," and dismissing class allegations prior to discovery and class certification proceedings is "rare" and "generally disfavored." *McCullen v. Union Pac. R.R. Co.*, No. 19-00347-CV-W-ODS, 2019 WL 3456815, at *3 (W.D. Mo. July 31, 2019) (citing cases).
>
> Construing the class claims liberally in Plaintiff's favor, the Court finds the amended complaint contains sufficient facts that state a plausible class action claim against Medicredit. Furthermore, the Court hesitates to foreclose the possibility of class-wide relief at the pleading stage. Instead, Plaintiff should be given the opportunity to conduct discovery on class certification issues. This Court and others have reached similar conclusions. *See, e.g.*, *Giesmann*, 2015 WL 3548803, at *6; *McCullen*, 2019 WL 3456815, at *4. The Court will, therefore, deny Medicredit's motion to dismiss the class allegations at this time.

*Miles*, 526 F. Supp. 3d at 493–94.  Likewise, here, "[c]onstruing the class claims liberally in Plaintiff's favor," the Court should deny Defendant's tried-and-failed arguments again. *Id.* at 494.

21

In denying defendant's motion to dismiss class action allegations in a TCPA case, the court in *Meyer v. Receivables Performance Mgmt.*, *LLC*, No. C12–2013, 2013 WL 1914392 at *2 (W.D. Wash. May 8, 2013), articulated the rationale for deferring decisions regarding class certification until after discovery has taken place, rather than deciding class certification on the pleadings, that is quite apposite here:

> RPM falls well short of convincing the court that Ms. Meyer cannot demonstrate commonality or the predominance of common questions. It asserts that Ms. Meyer will be unable to prove that RPM autodialed putative class members without their consent unless she presents individual evidence of each class member's consent (or lack thereof). That assertion is baffling. What if Ms. Meyer learns in discovery that RPM has never attempted to obtain the consent of any putative class member? What if Ms. Meyer learns in discovery that RPM purchases the debts it collects from third parties without making any attempt to determine if those third parties obtained the debtors' consent to autodialed phone calls? What if Ms. Meyer learns in discovery that RPM's corporate policy is to ignore people (like Ms. Meyer) who explicitly inform them that she does not consent to their phone calls? What if Ms. Meyer learns in discovery that RPM collects on the sort of over-the-counter consumer debts in which it is exceedingly unlikely that the consumer was asked for consent to later phone calls? The court could go on, but there is no need. It is entirely plausible that Ms. Meyer will uncover evidence that will permit her, on a classwide basis, to prove that no one (or virtually no one) consented to RPM's cellular phone calls. It is entirely plausible that Ms. Meyer, after discovery, will be able to demonstrate not only common questions, but common questions that predominate over individualized inquiries. Perhaps RPM is correct that consent or other issues will ultimately require an individualized inquiry, but there is no way to make that determination now. RPM's motion illustrates why courts typically decide class certification after discovery, not on the pleadings.

*Id.* Indeed, along these lines, Plaintiff here alleges that, "because of its *corporate policies and practices* Medicredit robocalls people to try to collect debts they do not owe," and that its "*business model* is focused on its bottom line without regard for the privacy of people." Complaint ¶¶ 11-12. And as noted by the Eighth Circuit, because of the "callers' superior access to records" in the TCPA context, courts are wary to "place the burden upon a litigant of establishing facts peculiarly

within the knowledge of the adversary." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 n.3 (8th Cir. 2017) (quoting *Schaffer v. Weast*, 546 U.S. 49, 60 (2005)) (cleaned up).[17]

### 2.   Fail-Safe Class

Defendant also argues that the class allegations be stricken because the class definition, recounted *supra*, comprises a fail-safe class.   A so-called "fail-safe class" is one whose membership can be ascertained only by determining the merits of a claim because the class is defined in terms of the ultimate question of liability; "[s]tated otherwise, the class definition is framed as a legal conclusion." *In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012); *see Giesmann v. Am. Homepatient, Inc.*, No. 4:14CV1538 RLW, 2015 WL 3548803, at *5 (E.D. Mo. June 8, 2015).   Class action defendants have long argued that fail-safe classes should not be certified because "the class definition precludes the possibility of an adverse judgment against class members; the class members either win or are not in the class." *In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012) (quotation and citation omitted); *Giesmann*, 2015 WL 3548803, at *5.

But, as with its motion to strike class allegations, Defendant's request is premature at best. *Giesmann*, 2015 WL 3548803, at *5 ("The Court finds that dismissing the class allegations at this juncture is premature. Contrary to Defendant's assertions, Plaintiff does not concede that the alleged class is a fail-safe class, and, at the pleading stage, the Court is unable to discern from the face of the complaint whether the alleged class is impermissible.") (footnotes omitted); *see Miles*, 526 F. Supp. 3d at 493 ("Where the pleadings fail to conclusively demonstrate whether the requirements of Rule 23 are met, the parties must be given the opportunity to discover and present

---

[17] Defendant also seemingly argues that, to be properly within the class, a class member need show he or she "was offended by receiving a prerecorded message." Memo at 21. Defendant cites no authority for this "offended" requirement, nor is Plaintiff aware of any.

documentary evidence on the class certification issue.").[18]  Afterall, "[t]he Court is not entertaining a motion to certify the class and finds these issues better left for a fully briefed and supported motion for class certification."  *Miles*, 526 F. Supp. 3d at 493 (quoting *Giesmann*, 2015 WL 3548803, at *5).  "Moreover, in the face of a 'fail-safe class,' district courts have broad discretion to redefine the class in order to avoid issues that such a class definition may present." *St. Louis Heart Ctr.,* 2013 WL 1076540, at *6 n. 7.[19]

Defendant's motion to strike is, thus, premature, at best. To the extent the Court is inclined to disagree, Plaintiff would seek leave to amend.

## IV.   Conclusion

Defendant's kitchen-sink approach here should be rejected. Plaintiff has adequately articulated his Article III standing and his substantive claims. Defendant's attempts at mounting unsupported constitutional challenges, peremptory affirmative defense based striking, and dismissal based on a blatant ignoring of Plaintiff's allegations, should not be countenanced by this Court. Defendant's Motion to Dismiss or Strike (Doc. 13) must be denied.

---

[18] Fail-safe class definitions can be readily cured with the aid of discovery, which often provides details that can be used to amend a class definition. *See, e.g.*, *Fennell v. Navient Sols., LLC*, No. 617CV2083ORL37DCI, 2019 WL 3854815, at *4 (M.D. Fla. June 14, 2019) (noting that fail-safe class definition could be cured by changing its language from "[a]ll persons [] whose cellular telephone was called [] with an automatic telephone dialing system" to all "individuals who were members of [defendant's marketing campaign whose name was revealed in discovery]"); *see also Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 694 (S.D. Fla. 2015) ("confronted with a fail-safe class, courts may revise or permit the plaintiff to cure the flawed definitions," and the fail-safe problem "often should be solved by refining the class definition rather than flatly denying class certification on that basis") (citations omitted) (collecting cases).

[19]*See also Adam v. CHW Grp., Inc.*, No. 21-CV-19-LRR, 2021 WL 7285905, at *11 (N.D. Iowa Sept. 9, 2021) (cited by Defendant, Memo at 23) ("However, in virtually every case that the court has reviewed, at the pre-class certification stage of litigation, when a proposed class is stricken for being determined to be a fail-safe class, the court allows the plaintiff the opportunity to amend the class definition…. [T]he fail-safe problem ... can and often should be solved by refining the class definition rather than by flatly denying class certification.") (quotations and citations omitted).

Respectfully submitted,

/s/ John A. Yanchunis
Alex Wolff
**Morgan and Morgan**
200 N. Broadway, Suite 720
St. Louis, MO 63102
314-955-1045
alexwolff@forthepeople.com

Billy Peerce Howard, Esquire
Florida Bar No. 0103330
Amanda J. Allen, Esquire
Florida Bar No. 0098228
**THE CONSUMER PROTECTION FIRM**
4030 Henderson Boulevard
Tampa, FL 33629
Telephone: (813) 500-1500
Facsimile: (813) 435-2369
Amanda@TheConsumerProtectionFirm.com
Billy@TheConsumerProtectionFirm.com

John A. Yanchunis
Florida Bar No. 324681
JYanchunis@ForThePeople.com
Patrick A. Barthle II
Florida Bar No. 99286
PBarthle@ForThePeople.com
Marcio W. Valladares
Florida Bar No. 0986917
MValladares@ForThePeople.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

Counsel for Plaintiff and the putative class

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered users.

*/S/ JOHN A. YANCHUNIS*