UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JASON SAGGIO and JUDE FURR, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 4:22-CV-01005-JAR |
| vs. | ) |
| | ) |
| MEDICREDIT, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' motion to exclude the opinion testimony of Plaintiff's class notice expert, Carla Peak, in this putative class action under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. For the reasons stated below, the motion will be denied.

**BACKGROUND**

The TCPA prohibits robocalls to cellphones except in emergencies or with the recipient's consent. Plaintiffs Jason Saggio and Jude Furr, on behalf of a proposed nationwide class, allege that Defendant Medicredit, a medical debt collector, erroneously and unlawfully placed robocalls to their cellphones to collect debts they didn't owe. Plaintiffs propose a class consisting of persons and entities in the United States to whom Defendant placed a robocall, between September 26, 2018, and the date of certification, to a cellphone number that was not assigned to a person with past-due medical debt.

Plaintiffs retained Carla Peak as an expert in class action notice and administration. Peak is the Vice President of Legal Notification Services for Verita Global, which specializes in comprehensive class action administration services. (Doc. 108-1). Verita has administered more

1

than 10,000 class actions, including TCPA wrong number cases, and has distributed settlement payments totaling over a trillion dollars in assets. (Doc. 111 at 1-2). Peak has more than 20 years of industry experience and has been involved in all aspects of the design and implementation of class action notice planning. She has served as an expert in over one hundred cases involving class action notice plans. Peak's curriculum vitae confirms her considerable experience and expertise in this field. (Doc. 108-1 at 15-25).

In discovery, Defendant produced spreadsheets of phone numbers designated as wrong numbers robocalled during the class period. Plaintiffs retained Peak to describe the notification process that Verita would undertake to effectuate notice to potential class members if this Court were to certify the proposed class. As detailed in her declaration (Doc. 108-1 at 2-13) and deposition (Doc. 108-2), the process can be summarized as follows. Verita would provide Defendant's list of wrong numbers to a database aggregator and identity verification service provider such as PacificEast, Nexxa, or Lexis Nexis. That company would perform a reverse look-up search to locate names and addresses associated with the cellphone numbers that received Defendant's robocalls during the class period. If one search leaves some numbers unidentified, the list could be provided to another company for another search, as their databases can vary. Addresses are checked against a database maintained by the United States Postal Service. The results of the searches can be cross-referenced with Defendant's collection records to verify that debtors are excluded from the mailing list. Notice is sent to all potential class members identified through the search process. Any notices returned undeliverable are re-sent to forwarding addresses if available, or further searches can be conducted using other databases. When necessary, Verita can undertake additional notification methods, such as paid media campaigns and messages to social media accounts of the targeted numbers.

Peak opines that this methodology "is consistent with other notice plans that have been utilized in similar court-approved TCPA class actions and has been deemed to provide the best notice practicable under the circumstances in those matters." (Doc. 108-1 at 12). She noted that a success rate of at least 70% is considered high, according to the Judges' Class Action Notice and Claims Process Checklist published by the Federal Judicial Center.[1] Peak cautioned that she offered no opinion or certainty of Verita's ability to precisely identify individual bona fide members of the class; she opined only on how to best effectuate optimal notice to potential class members. When asked how individual members would be identified, she explained that they would self-identify by responding to the notice.

Plaintiffs cite Peak's notice methodology in support of their pending motion for class certification under Fed. R. Civ. P. 23, which requires that a class be "adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016). Plaintiffs contend that the proposed class is ascertainable using Defendant's call records to obtain names and addresses, which Peak opines is a widely accepted method to identify and notify potential class members.

By the present motion, Defendant seeks to exclude Peak's testimony because (1) she is unqualified in data analytics and class member identification, (2) her proposed method for generating a notice list is unreliable for purposes of demonstrating ascertainability, and (3) her expertise in class notice *after* certification has no relevance to ascertainability as a *prerequisite* for class certification.

---

[1] https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last visited December 4, 2025).

## LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admission of expert testimony.  It states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 was amended in 2000 in response to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which charges trial judges with a "gatekeeping" role to screen expert testimony for relevance and reliability. *Id.* at 590–93; *see also Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) ("The main purpose of *Daubert* exclusion is to prevent juries from being swayed by dubious scientific testimony.").[2]  To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was properly applied to the facts at issue. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019). To satisfy the reliability requirement, the proponent must show by a preponderance of evidence that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. *Id*.  This basic gatekeeping obligation applies not only to scientific testimony but to all forms of expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999).

---

[2] Throughout this order, citations are cleaned up and internal citations are omitted.

The inquiry envisioned by Rule 702 is a flexible one, designed to exclude "vague theorizing based on general principles" or "unsupported speculation," but not requiring an opinion to be "a scientific absolute" in order to be admissible. *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 914–16 (8th Cir. 2017). In a recent amendment to Rule 702, effective December 1, 2023, the Advisory Committee noted that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Rather, proponents of expert testimony must establish admissibility of the proffered evidence by a preponderance of the evidence. Once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go to the weight of the evidence. *Id*.

A district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 791 (8th Cir. 2024). As long as the expert's testimony "rests upon good grounds, based on what is known" it should be tested by the adversarial process rather than excluded at the outset. *Id*. *See also Kumho Tire Co.,* 526 U.S. at 141–42 ("the test of reliability is 'flexible,'" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability opinion.").

Even after the 2023 amendment to Rule 702, the touchstone for the admissibility of expert testimony is whether it will be helpful to the trier of fact. *O'Hara v. Lott, et al.*, 2025 WL 2549231, at *12 (E.D. Mo. Sept. 4, 2025) (citing *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010)).

5

## DISCUSSION

In their pending motion for class certification, Plaintiffs contend that the proposed class is ascertainable through Peak's notice methodology, using Defendant's call records to conduct a reverse look-up yielding names and addresses of potential class members. In the present motion to exclude Peak's testimony, Defendant centrally argues that Peak isn't an expert on ascertainability, and her opinions on post-certification notice aren't reliable or relevant when analyzing ascertainability as a criterion *for* certification.

On the merits of ascertainability, Defendant postulates several scenarios where a person who received a robocall might not be the registered subscriber (i.e., owner) of the number as identified by a search. Reverse look-up searches sometimes identify multiple individuals linked to a single phone number. Dates of ownership might be inaccurate in a database. The call recipient could be a family member on a joint phone plan or a former subscriber before a transfer of ownership. Or, a bona fide debtor may have given Defendant a spouse's or caregiver's number. In her deposition, Peak acknowledged that the search process is imperfect.

From here, Defendant cites unpublished cases where district courts found these flaws fatal, reasoning that the expert's methodology wasn't reliable and class member identification would necessitate extensive individual inquiry. *Hunter v. Time Warner Cable Inc.*, 2019 WL 3812063, at *11 (S.D.N.Y. Aug. 14, 2019) (denying class certification); *Carroll v. SGS Auto. Servs., Inc.*, 2020 WL 7024477, at *7 (M.D. La. Nov. 30, 2020) (excluding notice expert); *Davis v. Capital One, N.A.*, 2023 WL 6964051, at 9 (E.D. Va. Oct. 20, 2023) (excluding expert and denying certification).

Conversely, Plaintiffs cite published cases where courts have accepted Peak's methodology and ultimately granted certification. In *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277

6

(D. Utah 2021), the court found Peak's "accepted and often used method" reliable and found her testimony relevant to the court's analysis of class manageability. *Id*. at 288-89. The court found the class ascertainable in that (1) it was defined by objective standards – i.e., noncustomers who received a cellphone robocall during the period and (2) class members could be identified using call logs and reverse look-up searches as described in Peak's notice plan. *Id*. at 302. The court rejected the defendant's argument that individualized issues, such as consent or whether the message actually played, rendered the class unascertainable. *Id*.

Likewise in *Head v. Citibank, N.A.*, 340 F.R.D. 145 (D. Ariz. 2022), the court found Peak's notice methodology reliable and her testimony relevant, reasoning, "notice need not perfectly identify bona fide class members; it need only be 'the best notice that is practicable under the circumstances.'" *Id*. at 156 (citing Fed. R. Civ. P. 23(c)(2)(B)). "The notice procedure Peak describes appears to be the best practicable notice—one that has worked in previous cases and should reasonably identify putative class members." *Id*.  As in *Wesley*, the court rejected the notion that individual issues would overwhelm class claims, instead finding common questions of fact and law predominant. *Id*. at 153-4.

Also in *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019), the court was "not concerned with whether the reverse lookup process will produce perfectly accurate results. Instead, the industry standard shows that the major data aggregators can be used, in connection with other methods like subpoenaing wireless carriers and cross-referencing addresses, to reasonably identify the most likely subscriber of the phone number on the relevant call date." *Id*. at 245.

Additionally, Plaintiffs note that Defendant previously acknowledged the adequacy of a notice plan similar to Peak's in an earlier TCPA class action before this Court.  *See Miles v.*

7

*Medicredit, Inc.*, No. 4:20-CV-1186-JAR, 2022 WL 3643669, at *2 (E.D. Mo. Aug. 23, 2022) (preliminarily approving the class settlement).

Put simply, Defendant seeks to exclude Peak's testimony because she can't guarantee perfectly accurate identification of every class member. As in *Head* and *Knapper*, the Eighth Circuit squarely rejected such a standard in *Sandusky*. There, the defendant sent unsolicited fax advertisements to business numbers obtained from a directory of healthcare providers. 821 F.3d at 994. The plaintiffs asserted that the list of numbers was sufficient to identify class members. The district court disagreed, reasoning that the parties would need to explore who owned, operated, and used the fax machines associated with the numbers, necessitating individualized inquiry to determine who actually received a fax. *Sandusky Wellness Ctr. LLC v. Medtox Sci., Inc.*, 2014 WL 3846037, at *3-4 (D. Minn. Aug. 5, 2014). The Eighth Circuit reversed, reasoning that the best *objective* indicator of the recipient is the person who subscribed to the number. *Sandusky*, 821 F.3d at 997. "True, the subscriber … may not be the recipient of the fax. However, fax logs showing the numbers that received each fax are objective criteria that make the recipient clearly ascertainable." *Id.*[3]

Here, Defendant has already produced call logs identifying wrong numbers and the date reported as such. The Court has ordered additional production of more detailed logs specific to each phone number, including the dates of each call. (Doc. 125). Peak proposes to use Defendant's data to identify potential class members, with cross-referencing and verification

---

[3] In its response opposing class certification, Defendant attempts to avoid *Sandusky*'s binding instruction by citing *St. Louis Heart Ctr., Inc. v. Vein Centers for Excellence, Inc.*, No. 4:12 CV 174 CDP, 2017 WL 2861878, at *1 (E.D. Mo. July 5, 2017), where the court decertified a class for lack of ascertainability. There, however, the evidence supplied only the number of faxes sent. There were no logs specifying which fax numbers resulted in successful transmission. By contrast here, Defendant can query its database to produce logs identifying cellphone numbers designated as wrong numbers and the dates of robocalls to those numbers, among other particulars.

steps to optimize accuracy. Guided by *Sandusky*, the Court finds that Peak's expert opinion is relevant to assist the Court in its evaluation of ascertainability. Separately, the Court finds Peak's opinion relevant to manageability as a component of superiority under Rule 23(b)(3). Further, the Court finds Peak's methodology reliable, as demonstrated through its wide acceptance and implementation by district courts throughout the country (Doc. 108-1 at 16-23 (collecting cases)) and confirmed by the Court's own experience with similar notice processes.

Finally, Defendant contends that Peak isn't qualified to opine on class member identification because she doesn't conduct the searches herself. Rather, Verita's operations team performs the technical work and Peak merely "runs a media team."  This argument discounts Peak's experience and advancement in the industry and ignores the structural realities of the workplace. The Court finds it entirely reasonable that an expert at Peak's executive level would collaborate with technical staff to effectuate database queries of this nature. "An expert witness is permitted to use assistants in formulating [her] expert opinion." *Pietoso, Inc. v. Republic Servs., Inc.*, 2025 WL 2643684, at *6 (E.D. Mo. Sept. 15, 2025) (reasoning that a financial expert can rely on data analysts in forming his opinion, citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 612 (7th Cir.2002)). Peak is qualified to offer her opinions here.

9

## CONCLUSION

The Court finds expert Peak qualified to opine on the best process and procedures to identify potential class members and ensure optimal notice using Defendant's call logs and reverse look-up searches. According to Eighth Circuit precedent, Defendant's call logs provide objective criteria to ascertain the proposed class. *Sandusky*, 821 F.3d at 997-98.  Accordingly, the Court finds Peak's opinions relevant to assist the Court in evaluating whether the class is ascertainable. Separately, the Court finds Peak's opinions relevant to the question of class manageability. The Court finds Peak's methodology reliable in that it has been widely utilized and recognized to identify potential class members and provide the best possible notice practicable in numerous class actions, including TCPA wrong number cases.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to exclude the testimony of Plaintiff's class notice expert, Carla Peak, is **DENIED**.  (Doc. 107).

Dated this 9th day of December, 2025.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE